Charles Reichmann (SBN 206699)
LAW OFFICES OF CHARLES REICHMANN
16 Yale Circle
Kensington, CA 94708
(415) 373-8849
charles.reichmann@gmail.com

Andrew N. Friedman, *pro hac vice forthcoming*
Douglas J. McNamara, *pro hac vice forthcoming*
Sally M. Handmaker (SBN 281186)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave. NW ● Fifth Floor
Washington, DC 20005
(202) 408-4600
afriedman@cohenmilstein.com
dmcnamara@cohenmilstein.com
shandmaker@cohenmilstein.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| BRIDGETT BURK, MARY BETH GRISI, and JASON ARICIU, individually and on behalf of all others similarly situated,<br><br>           Plaintiffs,<br><br>     vs.<br><br>FACEBOOK, INC., CAMBRIDGE ANALYTICA LLC;<br>          Defendants. | Case No:  3:18-cv-2504<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

# **TABLE OF CONTENTS**

INTRODUCTION ......................................................................................................... 2

PARTIES ...................................................................................................................... 3

JURISDICTION AND VENUE .................................................................................... 3

BACKGROUND .......................................................................................................... 4

      A.     Facebook Obtains Users' Personal Information to Market Itself to Advertisers .......... 4

      B.     Cambridge Analytica Obtains Users' Facebook Data to Market Itself to Clients ....................................................................................................... 6

      C.     Facebook's Flacid Attempt to Stop the Exploitation of Friends' Data ....................... 9

      D.     Facebook Apologizes and Promises to Do What it Previously Promised to Do ........ 10

      E.     Plaintiffs' Experiences ..................................................................................... 13

CLASS ACTION ALLEGATIONS .............................................................................. 15

CAUSES OF ACTION .................................................................................................. 17

      COUNT 1 – THE STORED COMMUNICATIONS ACT ................................................. 17

      COUNT 2 – BREACH OF CONTRACT ......................................................................... 18

      COUNT 3 – NEGLIGENCE .......................................................................................... 19

      COUNT 4 – CONVERSION ......................................................................................... 20

      COUNT 5 – VIOLATION OF THE UNFAIR COMPETITION LAW (UCL) ...................... 20

      COUNT 6 – UNJUST ENRICHMENT ........................................................................... 22

PRAYER FOR RELIEF ................................................................................................ 23

DEMAND FOR JURY TRIAL ..................................................................................... 23

CLASS ACTION COMPLAINT

2344343 v1

**INTRODUCTION**

1.       Plaintiffs file this class action on behalf of all Facebook users who, without their consent and contrary to their privacy settings, had their Facebook profile data misappropriated by Cambridge Analytica, LLC. This personal profile data ("personal information") included hometown, relationship status, friends, family, political views, website visits and "likes" – electronic thumbs up or down on articles, pictures, and comments. This personal information has great value to researchers, as well as advertisers, and political campaigns. The Plaintiffs, without their knowledge, consent, and without compensation, had their personal information taken by Cambridge Analytica and its agents.

2.       As first reported by *The Guardian* on March 17, 2018, a whistleblower from Cambridge Analytica revealed that Facebook negligently allowed third-parties to scrape personal information of non-consenting Facebook users through an application ("app") called, "This is Your Digital Life."[1] It has been estimated that up to 87 million, mostly in the United States, may have been improperly accessed by Cambridge Analytica.

3.       Facebook, which had previously agreed to a 2011 FTC Consent Order to better protect user privacy and prevent third parties from misappropriating personal information, has admitted its neglect in ads, in interviews, and before the U.S. Congress.

4.       Former Cambridge Analytica employees admitted that it used Plaintiffs' and other Class members' personal information to create personality profiles to assist in political campaigns.[2] Cambridge highlighted its voter profiling as part of its sales pitch to numerous campaigns, including for Senator Ted Cruz and then Donald J. Trump. Cambridge Analytica paid developers millions to get the Facebook data and has made millions of dollars off the Facebook personal information it misappropriated.

5.       On April 11, 2018, Facebook provided users a link to identify which Facebook users

---

[1] Carole Cadwalladr and Emma Graham-Harrison, "Revealed: 50 Million Facebook Profiles Harvested for Cambridge Analytica in Major Data Breach, *The Guardian* (Mar. 17. 2018), https://www.theguardian.com/news/2018/mar/17/cambridge-analytica-facebook-influence-us-election, last accessed, Mar. 22, 2018.

[2] *Id.*

CLASS ACTION COMPLAINT

1    had their data scraped by Cambridge Analytica without their consent.

2        6.      While many lawsuits were filed against the Defendants before that date, the named

3    plaintiffs were merely guessing as to whether they had consented, or that one of their friends had

4    taken the "This is Your Digital Life" quiz, leading to the plaintiffs' data being accessed by

5    Cambridge Analytica's agents.

6        7.      Facebook has confirmed that all of the named Plaintiffs herein 1) did not log into

7    "This is Your Digital Life;"; 2) that a Facebook friend of theirs did log on to that app; 3) that their

8    Facebook personal information was accessed. Moreover, all of the Plaintiffs herein set privacy

9    settings to "Friends", and did not permit public access to all of their Facebook profiles.

10       8.      Plaintiffs and similarly situated class members deserve compensation for Facebook's

11   admitted failure to protect their data, and disgorgement of any money Cambridge Analytica derived

12   from the stolen data.

13                                         **PARTIES**

14       9.      Plaintiff Bridgett J. Burk is a citizen and resident of Orlando, Florida.

15       10.     Plaintiff Mary Beth Grisi is a citizen and resident of Moseley, Virginia.

16       11.     Plaintiff Jason Ariciu is a citizen and resident of Kansas City, Missouri.

17       12.     Defendant Facebook, Inc., ("Facebook") is incorporated in Delaware, and its principal

18   place of business is 1 Hacker Way, Menlo Park, CA 94025 and thus is a citizen of Delaware and

19   California.

20       13.     Defendant Cambridge Analytica, LLC ("Cambridge Analytica") is a limited liability

21   company organized under the laws of the State of Delaware, with offices in New York City and

22   Washington, D.C and thus is a citizen of both of Delaware and New York.

23                                **JURISDICTION AND VENUE**

24       14.     This Court has subject matter jurisdiction over this action under 28 U.S.C.

25   §1332(d)(2) because this is a class action wherein the amount in controversy exceeds the sum or

26   value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the

27   proposed class, and at least one member of the class is a citizen of a state different from a Defendant.

28       15.     This Court has personal jurisdiction over Defendant Facebook because Facebook is

1   headquartered in California, and conducts business in the state of California.

2       16.     This Court also has personal jurisdiction over Defendant Cambridge Analytica

3   because it conducts business in California, and the challenged acts and practices occurred or were

4   otherwise facilitated in California.

5       17.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because a substantial

6   part of the events or omissions giving rise to the claims occurred in, were directed to, and/or

7   emanated from this District. Venue is also proper because Facebook's terms of service require that

8   claims are resolved "exclusively in the U.S. District Court for the Northern District of California or a

9   state court located in San Mateo County….".[3]

10                              **BACKGROUND**

11      **A.     Facebook Obtains Users' Personal Information to Market Itself to Advertisers**

12      18.     Facebook is a social networking site founded by Mark Zuckerberg, and over the

13  decades has amassed over 2.2 billion users.[4] Facebook has amassed highly personalized data about

14  its users, including name, gender, age, e-mail addresses, hometown, interests, relationship status,

15  education, workplace, and political or religious views.

16      19.     Facebook users can set their "privacy settings" to several different options. Those

17  who set it to "Public" permit anyone on or off Facebook to review their posts and pictures. Those

18  who select "Friends" limit access to "Your friends on Facebook." Another setting lets the user limit

19  which "Friends" can see certain posts. Finally, users' can select "Only Me" to prevent any other

20  users from seeing their profile. The Facebook profile can include information about residence, age,

21  interests, relationship status, and work and education history.

22      20.     Facebook users can reconnect with friends, family, co-workers, ex-boyfriends or

23  girlfriends, and passively compete with everyone as to who has the cutest kids/pets. Friends often

24  share news stories, and, in addition to expressing their opinions with written (occasionally correctly

25  spelled) word, with "likes". These unwinnable Facebook arguments may seem to be of little value in

26  deciding the world's problems, but are key to Facebook's revenue stream – targeted ads. Facebook

27

28      _____

        [3] https://www.facebook.com/terms.php, last accessed Apr. 19, 2018.

CLASS ACTION COMPLAINT

converts the data about searches, comments, likes, etc., into predictive modeling to target the Facebook user with certain ads.[4]

21.     In 2012, to attract revenue, Facebook created a feature that allowed companies to target Facebook users as a means of attracting advertisers: "Facebook has an answer to those wondering how it will justify its IPO price and keep revenues growing as it saturates key markets: a new behavioral ad targeting system. Facebook has been quietly rolling out the beta of 'Open Graph action spec targeting' which allows advertisers to target users by what they listen to, where they travel, what they buy, and other in-app activity."[5]

22.     App developers and commercial entities view Facebook data as valuable. A growing field of predictive psychological analysis can utilize seemingly disparate data to estimate how a user might react to information, ads, or even propaganda. According to a 2013 study by Cambridge University's Psychometrics Centre, an analysis of only Facebook "likes" could predict a user's skin color (with 95% accuracy), sexual orientation (with 88% accuracy), and whether they were a Democrat or Republican (with 85% accuracy).[6]

23.     Facebook's allowance of third-parties to run targeted ads is the economic engine of the free platform. In 2017, Facebook generated $39.94 billion ad revenues, constituting 98 percent of its revenue.[7]

24.     Facebook's business model creates a tension between advertisers and third parties that wish to exploit Facebook data and the privacy concerns of its users. As disclosed in a Federal Trade Commission proceeding, regardless of the Facebook privacy settings a user selected, "a user's choice to restrict profile information to 'Only Friends,' or 'Friends of Friends' would be ineffective

---

[4] https://www.facebook.com/business/products/ads/ad-targeting, last accessed Apr. 17, 2018.

[5] John Constine, "Facebook's Revenue Growth Strategy: Ad Targeting by In-App Behavior," *Tech Crunch* (Feb. 1, 2012), https://techcrunch.com/2012/02/01/action-spec-ad-targeting/, last accessed Apr. 16, 2018.

[6] "Facebook 'Likes' Predict Personality," *BBC News,* (Mar. 11, 2013), http://www.bbc.com/news/technology-21699305, last accessed Apr. 20, 2018.

[7] "Facebook's Advertising Revenue Worldwide From 009 to 2017 (in Million U.S. Dollars)," *Statista*, https://www.statista.com/statistics/271258/facebooks-advertising-revenue-worldwide/, last accessed Apr. 17, 2018.

1  as to certain third parties."[8] In fact, "Facebook has made profile information that a user chose to

2  restrict to 'Only Friends' or 'Friends of Friends' accessible to any Platform Applications that the

3  user's Friends may have used[.]"[9]

4        25.    Facebook settled with the FTC over charges it had deceived users by "telling them

5  they could keep their information on Facebook private, and then repeatedly allowing it to be shared

6  and made public." Facebook agreed to make its privacy and data sharing policies more prominent.

7  Further, Facebook would require app developers to adhere to Facebook's privacy policies including

8  not to sell information obtained without the user's affirmative consent to share data.[10]

9        26.    Around the same time, following a legal complaint by European privacy campaigner,

10  Facebook was urged by the Irish Data Protection Commissioner to tighten app permissions to avoid

11  "friends" data leakage. However, Facebook did not tighten permissions until 2015.[11]

12      **B.**    **Cambridge Analytica Obtains Users' Facebook Data to Market Itself to Clients**

13        27.    Cambridge Analytica is a political consulting firm that claims to offer tools to

14  identify American voters and influence their behavior. "Cambridge Analytica was created when

15  Steve Bannon approached conservative megadonors Rebekah and Robert Mercer to fund a political

16  consulting firm. Bannon became vice president of Cambridge Analytica, and during the 2016

17  election, he reached out to the Trump campaign to introduce the two sides."[12]

18        28.    Cambridge Analytica is owned by the SCL Group (Strategic Communication

19  Laboratories Group). SCL has been involved in political operations around the world.[13] SCL

20

21       [8] In the Matter of Facebook, Inc., a corporation, U.S. Federal Trade Commission Complaint

22  ("FTC Complaint"), at ¶ 14.

     [9] *Id.*

23       [10] *Id.* at 4.

24       [11] Natasha Lomas, "Facebook Data Misuse Scandal Affects 'Substantially' More than 50M,

25  Claims Wylie," Mar. 27, 2018, TechCruch, https://techcrunch.com/2018/03/27/facebook-data-misuse-scandal-affects-substantially-more-than-50m-claims-wylie/, last accessed Apr. 20, 2018.

26       [12] Alvin Chang, The Facebook and Cambridge Analytica Scandal, Explained with a Simple

27  Diagram," *Vox*, (Apr. 10, 2018), https://www.vox.com/policy-and-politics/2018/3/23/17151916/facebook-cambridge-analytica-trump-diagram, last accessed Apr. 20, 2018.

28       [13] *Id.*

1   proclaims to use "psychological warfare" and "influence operations" to support a political point of

2   view. It has even worked for the United States State Department to gather information on the Islamic

3   State.[14]

4          29.    In June of 2014, SCL entered into an agreement with Aleksandr Kogan and his

5   company, Global Science Research (GSR) regarding data collected from online personality tests.[15]

6          30.    According to a whistleblower and former Cambridge employee, Christopher Wylie,

7   the goal of Cambridge Analytica was to gain access to the personal information of users to create

8   profiles for microtargeting of polical ads. On March 27, 2018, Mr. Wylie testified before a UK

9   parliamentary select committee investigating the disinformation political campaigning. He testified

10  that:

11              There were several iterations of the Facebook harvesting project.... It first
                started as a very small pilot — firstly to see, most simply, is this data
12              matchable to an electoral register… We then scaled out slightly to make
                sure that [Cambridge University professor Alexsandr Kogan] could
13              acquire data in the speed that he said he could [via a personality test app
                called *thisisyourdigitallife* deployed via Facebook's platform]. So, the first
14              real pilot of it was a sample of 10,000 people who joined the app — that
                was in late May 2014. …That project went really well and that's when we
15              signed a much larger contract with GSR [Kogan's company] in the first
                week of June… 2014. Where the app went out and collected surveys and
16              people joined the app throughout the summer of 2014.[16]

17

18         31.    Wylie states that about 270,000 people took quizzes on the app.[17] He admits that the

19  goal of the app was to "explore mental vulnerabilities of people, then map out ways to inject

20  information into different streams or channels of content online so that people started to see things

21

22

23      [14] Kim Hjlemgaard, "Cambridge Analytica Active in Election, Big Data Projects for Years,"
        *USA Today* (Mar. 22, 2018), https://www.usatoday.com/story/news/world/2018/03/22/cambridge-
        analytica-profile/437210002/, last accessed Apr. 18, 2018.

24      [15] Carole Cadwalladr and Emma Graham-Harrison, "Revealed: 50 Million Facebook Profiles
25      Harvested for Cambridge Analytica in Major Data Breach, *The Guardian* (Mar. 17. 2018),
        https://www.theguardian.com/news/2018/mar/17/cambridge-analytica-facebook-influence-us-
26      election, last accessed, Mar. 22, 2018.

        [16] Lomas, n. 10, *supra.*

27      [17] "What is 'This is Your Digital Life'?: The Facebook App You May Be Alerted About," (PIX
28      11), http://pix11.com/2018/04/10/what-is-this-is-your-digital-life-the-facebook-app-you-may-be-
        alerted-about/, last accessed Apr. 19, 2018.

all over the place that may or may not have been true."[18]

32.     The data accumulated from the "This is Your Digital Life" went beyond those who took the quiz. The app developers "scraped" from the quiz takers the profiles of the friends to which they had access. This gave Kogan access to the friends' personal information including their actions, gender, groups, interest, location, notes, relationship status, religion, politics, subscriptions, website visits, and work history.

33.     The personal information the app was able to obtain via Facebook formed the "foundational dataset …. This is what built the company [Cambridge Analytica]. This was the foundational dataset that then was modeled to create the algorithms."[19]

34.     Cambridge Analytica's CEO Alexander Nix has denied that his company used Kogan and GSR's data. He has admitted that Cambridge paid $500,000 for it but subsequently "deleted the data."[20] There is little basis to believe him over Mr. Wylie. Nix was nixed by his own company after he bragged to a hidden camera that Cambridge Analytica would use bribery and blackmail to aid the campaigns of their clients.[21]

35.     According to Wylie, Kogan and GSR did in fact sell the Facebook data to SCL and Cambridge Analytica. Wylie has showed reporters evidence about the data misuse. It includes emails, invoices, contracts and bank transfers that reveal millions of Facebook profiles of registered US voters harvested via the scraping scheme.[22]

36.     In 2015 and 2016 Cambridge Analytica was hired by several candidates and causes to assist in microtargeting advertising, earning millions of dollars. This included Senator Ted Cruz's

---

[18] Alix Langone, "Facebook's Cambridge Analytica Controversy Could Be Big Trouble for the Social Network. Here's What to Know," *TIME* (Apr. 4, 2018), http://time.com/5205314/facebook-cambridge-analytica-breach/, last accessed Apr. 19, 2018.

[19] *Id.*

[20] *Id.*

[21] Adam Edelman, "Cambridge Analytica CEO Alexander Nix Suspended Amid Hidden Camera Expose." *NBC News*, (Mar. 20, 2018), https://www.nbcnews.com/politics/politics-news/cambridge-analytica-ceo-alexander-nix-suspended-amid-hidden-camera-expose-n858406, last accessed Apr. 20, 2018.

[22] https://www.theguardian.com/news/2018/mar/17/cambridge-analytica-facebook-influence-us-election, last accessed on Mar. 22, 2018.

1  failed presidential campaign. The Cruz campaign paid Cambridge Analytica $6 million to place
2  hyper-targeted messages and online ads in front of voters.[23]

3      37.    After Trump secured the Republican Presidential nomination, Cambridge Analytica
4  supported his campaign. From July 2016 through election day, Federal Election Commission show
5  that Donald Trump for President paid more than $5.9 million to Cambridge Analytica.[24]

6      38.    After the Trump victory, Cambridge Analytica CEO Nix boasted about the firm's
7  work for Trump. "We are thrilled that our revolutionary approach to data-driven communications
8  played such an integral part in President-elect Donald Trump's extraordinary win."[25] Nix also
9  claimed his company had a "secret sauce" that could sway consumer and voters far more effectively
10  than traditional advertising.[26]

11      **C.    Facebook's Flacid Attempt to Stop the Exploitation of Friends' Data**

12      39.    The conduct of Kogan and GSR violated Facebook's "platform policy." The policy
13  required that Facebook users [like Kogan and his organization] only collect friends' data to improve
14  user experience in the app and barred it being sold on or used for advertising.[27]

15      40.    Facebook became aware of SCL and Cambridge Analytica misusing Facebook
16  personal data in 2015. Its lawyers sent a letter to Cambridge in August of 2016 asking for
17  verification that any such data be deleted. Facebook blithely accepted a letter back from Cambridge
18  Analytica that it had done so.

19      41.    Facebook effectively accepted the word of thieves that that they would destroy the

20

21

22      [23] Cadwalladr, n. 19, supra.

23      [24] Price, "How Much Did Trump Pay Cambrdige Analytica? Denial of Data Firm's Involvement
       Doesn't Add Up," *Newsweek,* (Oct. 27, 2017), http://www.newsweek.com/trump-cambridge-
24      analytica-kushner-695315, last accessed Apr. 20, 2018.

25      [25] *Id.*

26      [26] David Ingram, "Factbox: Who is Cambridge Analytica and What Did it Do?," *Reuters,* (Mar.
       19, 2018), https://www.reuters.com/article/us-facebook-cambridge-analytica-factbox/factbox-who-
       is-cambridge-analytica-and-what-did-it-do-idUSKBN1GW07F, last accessed Apr. 20, 2018.

27      [27] Cadwalladr, n. 19, supra. *See also*
       https://web.archive.org/web/20141230035918/https://developers.facebook.com/policy/ ("Don't sell,
28      license, or purchase any data obtained from us or our services.")

8

1    proceeds of their heist. Facebook never bothered to follow up or conduct a forensic audit.[28]

2        42.    In addition, Facebook employees continued to assist Kogan and Cambridge after

3    Facebook had shut down Kogan's application.[29]

4        43.    Kogan maintains Facebook does little to stop third-party collection of Facebook

5    personal information. "There are so many commercial entities out there, companies collecting vastly

6    more data that don't care about their relationship with Facebook, and Facebook has no accounting

7    for that data whatsoever."[30] He stated that there are "tens of thousands of apps that are doing this

8    [harvesting data like his app did]."

9        44.    Kogan further noted, that many apps that Facebook permits on its platforms simply

10   flout the privacy settings Facebook users may employ. "What's amazing is if you go and look at

11   Facebook apps right now, many of them have language to say we can transfer and sell your data.

12   And I'm talking about some of the biggest companies in the world, and Facebook does nothing to

13   police this."[31]

14       **D.    Facebook Apologizes and Promises to Do What it Previously Promised to Do**

15       45.    A month after *The Guardian* story about Christopher Wylie's experiences became

16   public, Facebook founder and CEO Mark Zuckerberg spoke publicly about the events. He confirmed

17   much of what Christopher Wylie had stated in his testimony before Congress on April 11, 2018. Mr.

18   Zuckerberg's prepared statement said in part:

19            In 2013, a Cambridge University researcher named Aleksandr Kogan
             created a personality quiz app. It was installed by around 300,000 people
20           who agreed to share some of their Facebook information as well as some
             information from their friends whose privacy settings allowed it. Given
21           the way our platform worked at the time this meant Kogan was able to

22   _____

23       [28] *Id.*

24       [29] Carole Cadwalladr and Emma Graham-Harrison, "How Cambrige Analytica Turned
     Facebook 'Likes' Into a Lucrative Politcal Tool," *The Guardian*, Mar. 17, 2018,
25   https://www.theguardian.com/technology/2018/mar/17/facebook-cambridge-analytica-kogan-data-
     algorithm, last accessed Ap. 17, 2018

26       [30]Elizabeth Chuck, "Aleksandr Kogan Fires Back: Facebook Data Collection was 'Business as
     Usual'", *NBCNews*, (Apr. 23, 2018), https://www.nbcnews.com/tech/social-media/business-usual-
27   aleksandr-kogan-fires-back-facebook-over-cambridge-analytica-n868321, last accessed Apr. 23,
     2018.

28       [31] *Id.*

access some information about tens of millions of their friends.

In 2014, to prevent abusive apps, we announced that we were changing the entire platform to dramatically limit the Facebook information apps could access. Most importantly, apps like Kogan's could no longer ask for information about a person's friends unless their friends had also authorized the app. We also required developers to get approval from Facebook before they could request any data beyond a user's public profile, friend list, and email address. These actions would prevent any app like Kogan's from being able to access as much Facebook data today.

In 2015, we learned from journalists at *The Guardian* that Kogan had shared data from his app with Cambridge Analytica. It is against our policies for developers to share data without people's consent, so we immediately banned Kogan's app from our platform, and demanded that Kogan and other entities he gave the data to, including Cambridge Analytica, formally certify that they had deleted all improperly acquired data — which they ultimately did.

Last month, we learned from *The Guardian*, *The New York Times* and Channel 4 that Cambridge Analytica may not have deleted the data as they had certified. We immediately banned them from using any of our services. Cambridge Analytica claims they have already deleted the data and has agreed to a forensic audit by a firm we hired to investigate this. We're also working with the U.K. Information Commissioner's Office, which has jurisdiction over Cambridge Analytica, as it completes its investigation into what happened.[32]

46.    While Mr. Zuckerberg identified Cambridge Analytica as the entity that misappropriated Facebook data, he acknowledged Facebook's negligence: "But it's clear now that we didn't do enough to prevent [our] tools from being used for harm as well. That goes for the fake news, foreign interference in elections, and hate speech, as well as developers and data privacy. We didn't take a broad enough view of our responsibility, and that was a big mistake."

47.    Zuckerberg has made other admissions to Facebook's failure to protect the personal information of its users:

a.    "We have a responsibility to protect your data, and if we can't then we don't deserve to serve you. I've been working to understand exactly what happened and how to make sure this doesn't happen again."[33]

---

[32] Mr. Zuckerberg's prepared testimony is available at https://www.usatoday.com/story/tech/news/2018/04/09/read-facebook-ceo-mark-zuckerbergs-planned-testimony-before-congress/499097002/

[33] Sam Meredith, Facebook-Cambridge Analytica: A Timeline of the Data Hijacking Scandal," *CNBC*, (Apr. 10, 2018), https://www.cnbc.com/2018/04/10/facebook-cambridge-analytica-a-timeline-of-the-data-hijacking-scandal.html

b.    "This was a major breach of trust, and I'm really sorry this happened. You know, we have a basic responsibility to protect people's data and if we can't do that then we don't deserve to have the opportunity to serve people."[34]

c.    "I'm sorry we didn't do more at the time. We're now taking steps to ensure this doesn't happen again."[35]

48.    Other Facebook employees have made similar admissions. Sandy Parakilas, the platform operations manager at Facebook responsible for policing data breaches by third-party software developers between 2011 and 2012, stated that he warned senior Facebook executives years ago that this could happen: "[M]y concerns were that all of the data that left Facebook servers to developers could not be monitored by Facebook, so we had no idea what developers were doing with the data … It was well understood in the company that that presented a risk … Facebook was giving data of people who had not authorised the app themselves … It has been painful watching because I know that they could have prevented it."[36]

49.    Mr. Parakilas wrote to U.S. Senator Richard Blumenthal in April of 2018. In his letter, he noted attempts at auditing developers to ensure they are not violating Facebook's written policy were rare, and ineffective.[37] He further lamented that, "Despite the fact that executives at Facebook were well aware that developers could, without detection, pass data to unauthorized fourth parties (such as what happened with Cambridge Analytica), little was done to protect users."

50.    The FTC announced it was opening an investigation of Facebook for violating the 2011 Consent Order.[38] As noted by Senator Richard Blumenthal, "Facebook should have been aware

[34] Danielle Wiener-Bronner, "Mark Zuckerberg has regrets: 'I'm sorry that this happened'" CNN (Mar. 21, 2018), http://money.cnn.com/2018/03/21/technology/mark-zuckerberg-apology/index.html.

[35] Meredith, n. 37, supra.

[36] Paul Lewis, "'Utterly Horrifying': Ex-Facebook Insider Sayst Covert Data Harvesting Was Routine," *The Guardian* (Mar. 20, 2018), https://www.theguardian.com/news/2018/mar/20/facebook-data-cambridge-analytica-sandy-parakilas, last accessed Apr. 11, 2018.

[37] http://www.trbas.com/media/media/acrobat/2018-04/69858924372740-10160609.pdf, last accessed Apr. 23, 2018.

[38] Laura Sydell, "FTC Confirms It's Investigating Facebook for Possible Privacy Violations", *NPR*, (Mar. 26, 2018), https://www.npr.org/sections/thetwo-way/2018/03/26/597135373/ftc-confirms-its-investigating-facebook-for-possible-privacy-violations, last accessed Apr. 23, 2018.

11

1  that GSR was planning to violate developer platform rules based on the policies that developers are

2  required to submit. GSR's terms of service … stated explicitly that it reserved the right to sell user

3  data and would collect profile information from friends. These terms of services should have put

4  Facebook on notice that GSR may be seeking to sell user data." Zuckerberg admitted in his

5  Congressional testimony that Facebook "should have been aware that this application developer

6  submitted a [terms of service] that was in conflict with the rules of the platform."[39]

7       51.    Facebook knows precisely who amongst its users had their data "scraped" by

8  Cambridge Analytica. Starting on April 11, 2018, Facebook instructed users that when checking

9  their Facebook accounts, they will see one of two messages regarding its investigation:

 

[39] Apr. 19. 2018 letter from the Hon. Richard Blumenthal to the Hon. Maureen Ohlhausen, Acting Chairman, Federal Trade Commission, at 2. A copy of the letter may be found at Epic, "Senator Blumenthal Calls on FTC to Enforce Consent Order Against Facebook," (Apr. 20, 2018), https://epic.org/2018/04/senator-blumenthal-calls-on-ft.html

CLASS ACTION COMPLAINT

**E.      Plaintiffs' Experiences**

52.      Plaintiff Bridgett J. Burk has had a Facebook account since September 2006.

53.      Plaintiff never signed up for the "This is Your Digital Life" app, nor did she consent to Cambridge Analytica or its agents to access her Facebook personal information.

54.      , Ms. Burk set her Facebook user's settings to "Friends."

55.      On Tuesday April 10th, Ms. Burk saw several posts on social media about checking to see if her Facebook account had been compromised. On the morning of Wednesday April 11, 2018, she checked her Facebook account on her iPhone via the support link.[40] Ms. Burk took the following screenshot on her cellphone:



---

[40] See https://www.facebook.com/help/1873665312923476?helpref=search&sr=1&query=cambridge

56.     Mary Beth Grisi has had a Facebook account since 2005.

57.     Ms. Grisi never signed up for the "This is Your Digital Life" application. She did not consent to Cambridge Analytica or any of its agents to access her Facebook personal information.

58.     Ms. Grisi set her Facebook user's settings to "Friends."

59.     On April 11, 2018, she used the Facebook link regarding Cambridge Analytica to see if her personal information had been accessed without authorization. She received the same message as did Ms. Burk.

60.     Plaintiff Jason Ariciu has had a Facebook account since 2005.

61.     Mr. Ariciu never signed up for the "This is Your Digital Life" application. He did not consent to Cambridge Analytica or any of its against to access his Facebook personal information.

62.     Mr. Ariciu set his Facebook user's settings to "Friends."

63.     On April 11, 2018, Mr. Ariciu checked a link provided by Facebook and received the same message as Ms. Burk.

## CLASS ACTION ALLEGATIONS

64.     Plaintiffs bring this nationwide class action, pursuant to Rule 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, individually and on behalf of all members of the following Class:

> All persons identified by Facebook's records whose personal information was accessed by Cambridge Analytica and who had not signed up for the "This is Your Digital life" application, and did not have their profile setting as "Public."

65.     Excluded from the Class are the following individuals and/or entities: Defendants and their parents, subsidiaries, affiliates, officers and directors, current or former employees, and any entity in which Defendants have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

66.     Plaintiffs reserve the right to modify or amend the definition of the proposed Class

before the Court determines whether certification is appropriate.

67. **Numerosity:** The Class is so numerous that joinder of all members is impracticable. Facebook has identified millions of Facebook users who had their profile scraped by Cambridge Analytica, and the Class is apparently identifiable within Facebook's records.

68. **Commonality:** Questions of law and fact common to the Class exist, and which predominate over any questions affecting only individual class members. These include

a.  Whether Facebook breached its contract to protect its users' personal information;

b.  Whether and when Facebook learned of Cambridge Analytica's misconduct and whether its response was adequate;

c.  Whether Facebook owed a duty to the Class to exercise due care in collecting, storing, safeguarding, and/or obtaining their personal information;

d.  Whether Facebook breached that duty;

e.  Whether Cambridge Analytica unlawfully converted Plaintiffs and the Class members' personal information;

f.  Whether Cambridge Analytica was unjustly enriched by using Plaintiffs and the class members' data;

g.  Whether Defendants' conduct violated the SCA, 18 U.S.C. §§ 2701, *et seq.*;

h.  Whether Plaintiffs and the Class are entitled to equitable relief, including disgorgement and restitution;

i.  Whether Plaintiffs and the other Class members are entitled to actual, statutory, or other forms of damages, and other monetary relief.

69. **Typicality:** Plaintiffs' claims are typical of those of other Class members because all had their personal information misappropriated by Cambridge Analytica, due to Facebook's neglect and breach of contract.

70. **Adequacy:** Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Plaintiffs' Counsel are competent and experienced in litigating privacy-related class actions.

71.     **Superiority:** A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all the members of the Class is impracticable. Individual damages for any individual Class member are likely to be insufficient to justify the cost of individual litigation, so that in the absence of class treatment, Defendants' misconduct would go unpunished. Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the asserted claims. There will be no difficulty in the management of this action as a class action.

72.     Class certification is also appropriate under Fed. R. Civ. P. 23(a) and (b)(2), because Defendants have acted or have refused to act on grounds generally applicable to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class as a whole.

## CAUSES OF ACTION

### COUNT 1 – THE STORED COMMUNICATIONS ACT

#### (Against all Defendants)

73.     Plaintiffs incorporate all allegations as if fully set forth herein.

74.     Plaintiffs assert violations of the Stored Communications Act, 18 U.S.C. § 2702(a), for Defendants' unlawful gathering and/or disclosure of the content of Plaintiffs' and Class members' communications to third parties, including but not limited to SCL Group, Cambridge Analytica, and Aleksandr Kogan, and the campaigns of Ted Cruz and Donald Trump.

75.     The Stored Communications Act ("SCA") allows a private right of action against anyone who "(1) intentionally accesses without authorization a facility through which an electronic communication service is provided; or (2) intentionally exceeds an authorization to access that facility; and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system." 18 U.S.C. §§ 2701(a); 2707(a).

76.     The SCA defines "electronic storage" as "any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof; and any storage of such communication by an electronic communication service for purposes of backup protection of such communication."

77.     To create the information transferred to Facebook such as all posts, private messages,

16

and similar communication (collectively "Facebook content"), Facebook users transmit writing, images, or other data via the Internet from their computers or mobile devices to Facebook's servers. This Facebook content, therefore, constitutes electronic communications for purposes of the SCA.

78.     The servers Facebook uses to provide its electronic communications service to Facebook users are a "facility" within the meaning of the SCA.

79.     Because of the architecture of Facebook's servers, the sharing of information among Facebook users results in and constitutes interstate data transmissions.

80.     Defendants are "persons" within the meaning of the SCA.

81.     Defendant Facebook violated the SCA by intentionally allowing others (Kogan, GSR, and thereby Cambridge Analytica) to access Plaintiffs' personal information without Plaintiffs' consent, and therefore exceeded Facebook's authorization.

82.     Defendant Cambridge Analytica violated 18 U.S.C. § 2701(a) because it intentionally accessed, without authorization, either directly or indirectly through its agents, Plaintiffs' personal information and, in so doing, obtained unauthorized access to an electronic communication while in electronic storage.

83.     Pursuant to 18 U.S.C. § 2707(c), Plaintiff and Class members are entitled to a) minimum statutory damages of $1,000 per person; b) punitive damages; c) costs; and d) reasonable attorneys' fees.

### COUNT 2 – BREACH OF CONTRACT

### (Against Facebook)

84.     Plaintiffs incorporate all allegations as if fully set forth herein.

85.     Plaintiffs and Class members had agreements with Facebook, including Facebook's Data Use Policy and its Statement of Rights and Responsibilities. These policies, supported by the 2011 FTC Consent Order, required Facebook to protect the personal information of the Facebook users.

86.     Facebook enjoyed the financial benefits of an advertising platform provided by its social network. User enjoyed the benefit of the network with limitations placed on how their personal information can be shared. Plaintiffs and the purported class members all selected privacy

1    settings that limited per Facebook policies, what parties would have access to their data.

2          87.      The Plaintiffs' personal information on Facebook is of considerable value. This is

3    demonstrated by the billions paid by advertisers to Facebook; the millions paid by Cambridge

4    Analytica to GSR and Kogan; and the millions paid to Cambridge Analytica to harness the personal

5    data into predictive profiles.

6          88.      Facebook failed to adhere to it policies and keep its promises to Plaintiffs and

7    purported class members, breaching its agreement to user.

8          89.      As a result of the breach, Plaintiffs and Class members have been harmed and have

9    suffered damages by losing the value of their personal information.

10                                **COUNT 3 – NEGLIGENCE**

11                                 **(Against Facebook)**

12          90.      Plaintiffs incorporate all allegations as if fully set forth herein.

13          91.      Facebook owed a duty to Plaintiffs and the Class members to exercise reasonable care

14    in obtaining, using, and protecting their personal information from unauthorized third-parties.

15          92.      Facebook knew that the personal information of Plaintiffs and the Class had value –

16    indeed, it made Facebook an attractive platform for advertising in the billions of dollars.

17          93.      Given the nature of the information, Facebook had a special relationship with

18    Plaintiffs and the Class members. Plaintiffs and Class members signed up for Facebook's services

19    and agreed to provide their information with the understanding that Facebook would undertake

20    safeguards, would inform Plaintiffs and the Class of any privacy intrusions, and would not use the

21    information beyond its intended purpose.

22          94.      Plaintiffs and the Class members selected privacy settings—created by Facebook—to

23    limit public access to their personal information on Facebook.

24          95.      Facebook violated its obligation to protect Plaintiffs' personal information by

25    allowing Cambridge Analytica and its entities to obtain this information without the consent of

26    Plaintiffs and Class members.

27          96.      Facebook also breached its duties by failing to adopt earlier the safeguards it

28    promised in the 2011 FTC Consent Order and that it is now promising to employ to protect Plaintiffs

and Class members' personal information.

97.     The injury and harm suffered by Plaintiff and the Class members was reasonably foreseeable. As conceded by Facebook's own employee, "I know that they could have prevented it."[41]

98.     Absent Facebook's wrongful and negligent breach of its duties owed to Plaintiffs and Class members, their information would not have been improperly used by Facebook or disclosed to Cambridge Analytica and other third parties. Facebook's negligence was a direct and proximate cause of the misuse and disclosure of Plaintiffs' and Class members' information, resulting in damages – the Plaintiffs' loss of personal information that possessed value to third-parties.

**COUNT 4 – CONVERSION**

**(Against Cambridge Analytica)**

99.     Plaintiffs incorporates all allegations as if fully set forth herein.

100.    Plaintiffs and Class members were the owners and possessors of their personal information, having a right to determine who could access it.

101.    As a result of Defendant's wrongful conduct, Defendant has interfered with the Plaintiffs' and Class members' rights to possess and control such property, to which they had a superior right of possession and control at the time of conversion.

102.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members suffered injury, damage, loss, or harm, and therefore seek compensatory damages.

103.    In converting Plaintiffs' and Class members' information and behavioral data, Defendant has acted with malice, oppression and in conscious disregard of Plaintiffs' and Class members' rights. Plaintiffs, therefore, seek an award of punitive damages on behalf of the Class.

**COUNT 5 – VIOLATION OF THE UNFAIR COMPETITION LAW (UCL)**

**(Against All Defendants)**

104.    Plaintiffs incorporate all allegations as if fully set forth herein.

105.    California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, prohibits "any

---

[41] Lewis, n. 40, supra.

CLASS ACTION COMPLAINT

unlawful, unfair or fraudulent business act or practice."

106.    A business act or practice is "unlawful" when it is proscribed by some other statute, regulation, or constitutional provision.

107.    Defendant Cambridge Analytica was obligated under Facebook's terms of service to not misuse any data. Those terms of service required the application of California law.[42]

108.    Defendants engaged in business acts or practices that were proscribed by law, including violation of the Stored Communications Act and the 2011 FTC Consent Order.

109.    Defendants' actions also violate the unfair prong of the UCL. Defendant Cambridge Analytica took personal information without consent, contrary to public policy, causing substantial injury, including to Plaintiff and Class members. The harm caused by Defendant Cambridge Analytica's conduct outweighs any potential benefits attributable to such conduct and there were reasonably available alternatives to Defendant Cambridge Analytica – such as seeking consent or purchasing from Plaintiffs' their Facebook personal information – that Defendant Cambridge Analytica forewent.

110.    Defendant Facebook also engaged in an unfair business practice under the UCL. Defendant Facebook provided the Plaintiffs and Class members supposed privacy settings that misrepresented who had access to their Facebook data, but that Facebook did not really enforce. Facebook allowed app developers a free hand at scraping data, even after being warned by its own employees that this was occurring. Facebook also failed to alert the Plaintiffs and Class members who had their personal information accessed without their consent before April 11, 2018— something Facebook appears it could have done. Defendant Facebook's caused substantial injury to the Plaintiffs and Class members. This harm outweighs any potential benefits attributable to its conduct, and there were reasonably available alternatives to Defendant Facebook.

111.    As a direct and proximate result of Defendants' unlawful business acts and practices, Plaintiffs and the Class suffered injury in fact and lost money or property, including their loss of the

---

[42]  Platform Policy § 3 for Facebook (2014), available at https://web.archive.org/web/20141230035918/https://developers.facebook.com/policy/ (archived Dec. 30, 2014).

benefit of their bargain. Plaintiffs shared personal information with Facebook under the promise that Facebook would limit access to that personal information consistent with the privacy settings. Facebook failed to deliver on that promise and shared the valuable data to developers like Kogan and Cambridge Analytica. The Defendants' conduct has taken from Plaintiffs the opportunity to control how their personal information is used, and their personal information now has a diminished value.

112.    Because of Defendants' unlawful business acts and practices, Plaintiffs and Class members are entitled to relief, including attorneys' fees and costs, restitution, declaratory relief, and a permanent injunction enjoining Defendants from its unlawful and unfair practices. Plaintiffs also seek reasonable attorneys' fees and costs under applicable law, including Federal Rule of Civil Procedure 23 and California Code of Civil Procedure §1021.5.

### Count 6 – Unjust Enrichment

### (Against Cambridge Analytica)

113.    Plaintiffs incorporate all allegations as if fully set forth herein.

114.    Cambridge Analytica derived millions of dollars in business based upon Plaintiffs' and Class members' personal information. Cambridge Analytica claimed to develop profiles from the Facebook data that allowed it to predict what messages would influence voters, and then used this "secret sauce" to drum up business from campaigns like Ted Cruz and Donald Trump. Those campaigns alone paid Cambridge Analytica over $11 million.

115.    The millions in revenue Cambridge Analytica obtained is a benefit conferred upon it by Plaintiffs and the Class.

116.    Cambridge Analytica would be unjustly enriched if it is allowed to retain the revenues it obtained through its unauthorized and uncompensated use of Plaintiffs' and the Class members' personal information.

117.    Plaintiffs and Class members are entitled to recover the amount by which Defendants were unjustly enriched at their expenses.

118.    Accordingly, Plaintiffs, on behalf of themselves and each Class member, seek damages against Cambridge Analytica in the amounts by which it has been unjustly enriched at Plaintiffs' and each Class Member's expense.

1

## **PRAYER FOR RELIEF**

2      WHEREFORE, Plaintiffs, on behalf of themselves and all Class members, requests judgment

3  be entered against Defendants and that the Court grant the following:

4      a.      An order certifying each a class and appointing Plaintiffs and their Counsel to

5  represent the Class;

6      b.      An order enjoining Facebook from engaging in the wrongful conduct alleged herein

7  concerning disclosure and inadequate protection of Plaintiffs' and Classes' personal information;

8      c.      An order of disgorgement of wrongfully obtained profits;

9      d.      An award of compensatory, statutory, and punitive damages, in an amount to be

10  determined;

11     e.      An award of reasonable attorneys' fees costs and litigation expenses, as allowable by

12  law;

13     f.      Such other and further relief as this Court may deem just and proper.

14

## **DEMAND FOR JURY TRIAL**

15     Plaintiffs demand trial by jury for all issues so triable.

16  Dated: April 26, 2018          By:  */s/Charles Reichmann*

17                                       Charles Reichmann (SBN 206699)
                                         LAW OFFICES OF CHARLES REICHMANN
18                                       16 Yale Circle
                                         Kensington, CA 94708
19                                       (415) 373-8849
                                         charles.reichmann@gmail.com
20

21                                       Andrew N. Friedman, *pro hac vice forthcoming*
                                         Douglas J. McNamara, *pro hac vice forthcoming*
22                                       Sally M. Handmaker (SBN 281186)
                                         COHEN MILSTEIN SELLERS & TOLL PLLC
23                                       1100 New York Ave. NW ● Fifth Floor
                                         Washington, DC 20005
24                                       (202) 408-4600
                                         afriedman@cohenmilstein.com
25                                       dmcnamara@cohenmilstein.com
                                         shandmaker@cohenmilstein.com
26

27                                       *Attorneys for Plaintiffs*

28

CLASS ACTION COMPLAINT